**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**ALFONSO WHITE,**

**Plaintiff,**

**vs.**                                                         **Case No. 14-cv-0059-DRH-CJP**

**CAROLYN W. COLVIN,
Acting Commissioner of Social
Security,**

**Defendant.**

## MEMORANDUM and ORDER

**Herndon, District Judge:**

In accordance with 42 U.S.C. §405(g), plaintiff Alfonso White seeks judicial review of the final agency decision denying his application for Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. §423.

## Procedural History

Plaintiff applied for benefits on October 7, 2008, alleging disability beginning on August 1, 2008. (Tr. 15). After holding an evidentiary hearing, Administrative Law Judge (ALJ) George Gaffaney denied the application in a decision dated April 19, 2012. (Tr. 15-24). The Appeals Council denied review and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

1. The ALJ erred in determining plaintiff's RFC by failing to include additional limitations suggested by a treating source, failing to accord proper weight to the treating source's opinion, and failing to account for medical evidence favorable to plaintiff's claim.

2. The ALJ failed to properly evaluate plaintiff's credibility and address plaintiff's specific testimony.

### Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[1]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3).  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals

---

[1] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.  For all intents and purposes relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.  Most citations herein are to the DIB regulations out of convenience.

has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and

cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001)(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve

conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Gaffaney followed the five-step analytical framework described above. He determined that plaintiff had not been engaged in substantial gainful activity since the alleged onset date. The ALJ found that plaintiff had severe impairments of depression, personality disorder, and congestive heart failure. (Tr. 16). The ALJ further determined that these impairments do not meet or equal a listed impairment. (Tr. 17).

The ALJ found plaintiff had the residual functional capacity (RFC) to perform work at the light level, with physical and mental limitations. (Tr. 19). The ALJ determined plaintiff had no past relevant work. Based on testimony from a vocational expert (VE), the ALJ found that plaintiff was not disabled because he was able to perform work that exists in significant numbers in the regional and national economies. (Tr. 23-24).

## The Evidentiary Record

The court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by the plaintiff.

### 1. Agency Forms

Plaintiff was born in 1975 and was thirty-two years old on the date the application was filed. (Tr. 169). He last worked in 2006 for five months at a factory. Prior to that, he worked as a janitor in a hotel from 1992 until 1997. (Tr. 173). Plaintiff claimed complications from being shot four times and a mental disorder limited his ability to work. He stated he stopped working in 2006 because he fought too much and he was unable to be around other people. (Tr. 182). Plaintiff took anger management classes while incarcerated and never completed his GED. (Tr. 187).

In November 2008 plaintiff's mother completed a function report. She lived with plaintiff and stated she performed the household chores, shopped, cooked, and made sure plaintiff took his medications. (Tr. 190-93). She stated he was in pain constantly and was scared of others. (Tr. 192-93). Plaintiff was unable to pay bills and had no hobbies. (Tr. 193-94). She reported plaintiff had difficulty lifting, sitting, squatting, bending, standing, walking, kneeling, climbing stairs, hearing, remembering, understanding, concentrating, completing tasks, following instructions, and getting along with others. (Tr. 195). Plaintiff's mother stated he had trouble sleeping and walked with a cane due to his back and leg problems. (Tr. 196).

Plaintiff completed function reports in November 2008 and May 2009. (Tr. 201-11, 235-45). In plaintiff's first function report he was living at a halfway house with several other former inmates. (Tr. 201). He reported difficulty

sleeping, and stated he did not go outside at times due to fear. (Tr. 202, 204). He did not have a bank account and reported having no hobbies. (Tr. 204-05). Plaintiff stated he had difficulty bending, climbing stairs, seeing, remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others. (Tr. 206).

In the function report submitted in 2009 plaintiff reported living with his mother. (Tr. 235). He stated he occasionally fixed cereal, needed reminders to take his medication, and performed few household chores. (Tr. 237). Plaintiff reported rarely leaving the house to attend appointments with his doctors. (Tr. 239). He stated he had trouble lifting, squatting, bending, standing, kneeling, climbing stairs, remembering, concentrating, understanding, and getting along with others. (Tr. 240).

**2. Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing on April 11, 2012. (Tr. 33). Plaintiff stated he was 5'9" and weighed 169 pounds. (Tr. 35). He lived with his mother and had no source of income. (Tr. 36). He did not have a driver's license due to a DUI conviction. (Tr. 40-41). Plaintiff testified that he had not consumed alcohol in almost a year and had no problems with drugs. (Tr. 41).

Plaintiff testified that he was unable to work due to his inability to be around others. He stated when he had to associate with more than three people he began sweating heavily and was easily angered. Additionally, plaintiff stated he heard voices several times a week. He received psychiatric treatment from Dr.

Muddasani, who gave plaintiff monthly injections of Invega to help treat his schizophrenia. While plaintiff heard voices less frequently with the injections, they still occurred three or four times per week. (Tr. 37-38).

Plaintiff had problems with his back and stomach due to several gunshot wounds. (Tr. 38). He stated it was difficult for him to bend down or get out of chairs and he had back pain when he would lie down. He took daily medication for his stomach and back pain, hypertension, and asthma. (Tr. 38-9, 41). Plaintiff testified that he did not feel he had any side effects from his medications. (Tr. 38, 41). He felt the farthest he was able to walk without rest was a couple blocks because his legs would give out on him. (Tr. 42).

Plaintiff stated that he did not clean or do any laundry as his mother performed most of the household chores. (Tr. 39-40). He did not cook and could not use a stove, but was able to occasionally use the microwave when he made bologna sandwiches. (Tr. 40). He smoked a pack of cigarettes per day and did not exercise. (Tr. 42).

Plaintiff stated that his last job was in 2005 cleaning at Target where he was "paid under the table." He had to stop working due to lack of transportation and his gunshot wounds. (Tr. 36). Plaintiff completed the 10th grade. (Tr. 44).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age, limited education, and work history who was able to do light work, limited to sitting and standing for six hours in an eight-hour workday, and he was

limited to walking two blocks at a time. Additionally, he could only perform simple, routine unskilled tasks with only an occasional change in routine work setting, and only occasional interaction with the public, coworkers, or supervisors. (Tr. 45).

The ALJ and VE established plaintiff had no prior relevant work. The VE testified that the person could perform jobs that exist in significant numbers in the national economy. Examples of such jobs are pricer, cleaner, and laundry folder. (Tr. 45). Upon further questioning the VE stated that no jobs could be performed if the person would miss three or more days of work per month. (Tr. 46). \

### 3. Medical Treatment

In 2004, while plaintiff was in prison, he reported depression and was placed on Prozac. (Tr. 297). Records from the Department of Justice indicate plaintiff was not compliant with his medication. (Tr. 298). In 2006, plaintiff was hospitalized for eleven days due to gunshot wounds. (Tr. 391-402). He underwent surgery for bowel resection, right kidney removal, and related procedures. (Tr. 391). In February 2007, plaintiff underwent an additional surgery to remove one of the bullets. (Tr. 402).

In October 2008, plaintiff reported to Metropolitan St. Louis Psychiatric Center feeling anxious, worried, and irritable. (Tr. 509-10). The provider indicated plaintiff's insight and judgment were normal, his intelligence was below

average, and he had a GAF score of 75[2]. (Tr. 511-12). That month, an additional provider from the Psychiatric Center indicated plaintiff had a personality disorder and assigned plaintiff a GAF score of 55.  (Tr. 525).

Upon referral from the Psychiatric Center, plaintiff received psychological treatment at the Hopewell Center in October 2008. (Tr. 530-36). Plaintiff stated he first became depressed in the early 1990's when he was "gang banging." (Tr. 531). He stated he was anxious, depressed, had difficulty sleeping, heard voices, and did not like being around others. (Tr. 531). He was previously incarcerated for five years due to involvement with drugs and firearms. (Tr. 532). The provider's impressions were major depressive disorder and schizophrenia. (Tr. 536). Plaintiff returned to the Hopewell center two more times where he was diagnosed with schizophrenia and depression and assigned GAF scores ranging from 40 to 47. (Tr. 537-48).

In 2009, plaintiff began receiving treatment from family nurse practitioner Denise Jordan. (Tr. 649). Plaintiff regularly saw Ms. Jordan in 2009, 2010, and 2011. (Tr. 639-54, 715-17). She often noted plaintiff had hypertension, asthma, GERD, and alcohol and tobacco use. (Tr. 639-49, 715-17). Plaintiff typically presented to Ms. Jordan when he was out of medication. (Tr. 639, 640, 641, 645, 649, 715-17).

---

[2] The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations is not considered. *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* - Fourth Edition, Text Revision 32-33 (4th ed. 2000); Although the American Psychiatric Association recently discontinued use of the GAF metric, it was still in use during the period plaintiff's examinations occurred.

Plaintiff presented to Touchette Kenneth Hall Regional Hospital in December 2011 with gastrointestinal issues. (Tr. 656-93). His discharge summary noted a syncopal episode, schizoaffective disorder, congestive heart failure, acute alcohol withdrawal, anemia, hypertension, and hypokalemia. (Tr. 656-57).

In 2009 and 2012, plaintiff received mental health treatment four times from Southern Illinois Healthcare Foundation where he was treated by Drs. Muddasani and Albarcha. (Tr. 719-24). Dr. Muddasani diagnosed plaintiff with schizoaffective disorder, alcohol dependence, congestive heart failure, and anemia. He prescribed Invega injections. (Tr. 722-24). He felt plaintiff was a high risk for noncompliance, relapse, and suspected plaintiff had ongoing alcohol abuse. (Tr. 722).

### 4. Opinion of Treating Nurse Practitioner

In March 2011 Ms. Jordan completed an assessment of plaintiff's residual functional capacity. She diagnosed plaintiff with hypertension, gerd, asthma, and paranoia schizophrenia. Based on these impairments, Ms. Jordan felt plaintiff's pain and symptoms would constantly interfere with his concentration on work and he was incapable of even a low stress job. She stated his paranoia made him unable to function with other people. Ms. Jordan opined that plaintiff could sit, stand, or walk less than two hours out of an eight hour day and he could carry up to twenty pounds frequently. She felt plaintiff would have more than four bad days per month that would prevent him from attending work. (Tr. 633-637).

### 5. Consultative Examinations

Plaintiff had two physical and two mental consultative examinations performed by state agency physicians. The first physical consultative examination was performed by Dr. Elbert Cason in January 2009. Dr. Cason opined that plaintiff's examination was primarily unremarkable. His clinical impressions were a history of multiple gunshot wounds to the abdomen with partial liver resection, and right kidney removal, a bandage on his left forehead from a recent fight, moderately overweight, and mental problems for which he is seeing a psychologist. (Tr. 565).

The second physical examination was performed by internist Raymond Leung in July 2009. (Tr. 608-11). Dr. Leung also reported a primarily normal examination and noted plaintiff was not entirely cooperative with the physical examination. Plaintiff did not want to bend at his lumbar spine, however later he bent over 70 degrees to pick something up off of the ground. Dr. Leung's impression was gunshot wounds. (Tr. 610).

In January 2009 plaintiff had his first mental consultation with Dr. Lois Mades. (Tr. 571-75). Dr. Mades opined plaintiff had no evidence of thought disturbance but had slightly limited insight and judgment. Dr. Mades stated that while plaintiff's claimed auditory hallucinations were present, they did not appear credible as reality testing was adequate and his flow of thought was logical. She diagnosed plaintiff with alcohol abuse, antisocial personality disorder, mood disorder NOS, and assigned him a GAF score of 75. She did not feel plaintiff could manage his own funds due to ongoing alcohol abuse. (Tr. 575).

Plaintiff's final mental consultative examination was performed in July 2009 by Dr. Stephen Vincent. (Tr. 604-06). Dr. Vincent was concerned about plaintiff's responses as he opined they seemed to be magnified to cause plaintiff to appear more disabled. Dr. Vincent felt plaintiff's effort was suspect as he refused to spell words backwards, interpret proverbs, or attempt serial sevens calculations. (Tr. 605). Dr. Vincent's conclusions were plaintiff had a history of vague symptoms including some signs of depression. His diagnostic impressions were depression NOS, probable history of polysubstance abuse and dependence, and antisocial personality traits. (Tr. 606).

### 6. State Agency RFC Assessments

Plaintiff had two mental RFC assessments where state agency consultants reviewed the medical record but did not examine plaintiff. The first assessment was performed in February 2009 by Robert Cottone, Ph.D. He felt plaintiff was markedly limited in his ability to understand, remember, and carry out detailed instructions. Additionally, he opined that plaintiff was moderately limited in his ability to maintain attention and concentration, work in coordination with others, complete a workweek, interact appropriately with the general public, get along with others, and set realistic goals or make plans independently of others. (Tr. 589-90).

In August 2009, Donald Henson Ph.D. completed the second mental RFC assessment. He felt plaintiff was moderately limited in his ability to interact appropriately with the general public, carry out detailed instructions, perform

activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 626-27).

**Analysis**

Plaintiff first argues the ALJ incorrectly determined his RFC by failing to consider additional limitations, failing to sufficiently account for medical evidence favorable to plaintiff, and improperly analyzing his treating source's opinion. As plaintiff relies in part on his testimony for his arguments regarding his RFC, the court will first consider plaintiff's second argument that the ALJ erred in his credibility analysis.

It is well-established that the credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case." *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).

The ALJ is required to give "specific reasons" for his credibility findings and to analyze the evidence rather than simply describe the plaintiff's testimony. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). See also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)(The ALJ "must justify the credibility finding with specific reasons supported by the record.") The ALJ may rely on conflicts between plaintiff's testimony and the objective record, as "discrepancies between

objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). However, if the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

Plaintiff first takes issues with the ALJ's usage of boilerplate language that has been criticized in cases such as *Parker v. Astrue*, 597 F.3d 920 (7th Cir. 2010), and *Brindisi v. Barnhart*, 315 F.3d 783 (7th Cir. 2003). However, the use of the boilerplate language does not necessarily require remand. The use of such language is harmless where the ALJ goes on to support his conclusion with reasons derived from the evidence. See, *Pepper v. Colvin*, 712 F.3d 351, 367-368 (7th Cir. 2013); *Shideler v. Astrue*, 688 F.3d 306, 310-311 (7th Cir 2012).

Plaintiff argues the ALJ's analysis was insufficient as he did not address the credibility of specific portions of his testimony, explain the basis for rejecting his testimony, or clarify how much weight he actually gave the testimony. Contrary to plaintiff's suggestion, "an ALJ's credibility findings need not specify which statements were not credible." *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012). SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.

It is clear ALJ Gaffaney considered the relevant factors and supported his conclusion with reasons derived from evidence. See, SSR 96-7p. He thoroughly reviewed plaintiff's medical history and recorded statements. He concluded plaintiff's inconsistent statements, objective medical evidence, vague and equivocal allegations, and opinion evidence did not support plaintiff's claim of disabling pain.

For example, the ALJ noted that plaintiff made inconsistent statements regarding his alcohol abuse. He testified that he last consumed alcohol a year prior to the evidentiary hearing in April 2012. However, emergency room treatment notes from December 2011 indicated plaintiff had recently been drinking heavily. (Tr. 19, 41, 659). The ALJ noted progress reports indicated plaintiff was positive for alcohol abuse in September and December 2011. (Tr. 19, 715-16). Additionally, in March 2012, a treating physician suspected plaintiff had ongoing alcohol abuse. (Tr. 19, 722). These inconsistent statements lessened the reliability of plaintiff's allegations of disability.

ALJ Gaffaney noted plaintiff's alleged limitations from his disabilities were unsupported by the medical evidence on record. The ALJ stated that a majority of the evidence on record was diagnostic in nature and not particularly indicative of plaintiff's functional capacity. For example, a psychiatric evaluation noted plaintiff had paranoid schizophrenia but failed to indicate any functional or workplace limitations. (Tr. 20, 602). The ALJ noted plaintiff's course of treatment did not include extensive psychiatric counseling or hospitalization. While plaintiff was

incarcerated his mental status assessments repeatedly suggested no significant mental health problems. He was prescribed psychotropic medications but was never recommended for counseling or further psychiatric treatment. (Tr. 20). Additionally, the consultative examiners' reports indicated plaintiff was uncooperative and seemingly exaggeratory in his statements. State agency consultants repeatedly noted plaintiff's allegations were not consistent with a psychotic disorder and that his effort within the examinations was suspect. (Tr. 21, 571-73, 605-06, 610). All of these factors led to the ALJ's determination that plaintiff's allegations were not entirely credible.

The ALJ then looked at plaintiff's allegations of his own functional capacity. He felt they were vague and equivocal because he "offered nothing that mitigated the conclusion that [he] could work, with some limitation on contact with others." (Tr. 21). The ALJ stated that when the plaintiff is unable to provide discernable functional limitations he has diminished credibility in the broad conclusion that he cannot work.

Finally, ALJ Gaffaney stated the opinion evidence on record indicated a higher level of functioning than alleged. He discussed in detail the opinions of several state agency physicians that indicated plaintiff's capabilities were not as diminished as he claimed. For instance, Dr. Lynn Mades performed a mental status assessment and determined plaintiff had no evidence of thought disturbance, minimal evidence of mood impairment as well as substance use and personality issues. Dr. Mades felt plaintiff's prognosis was good if he could

abstain from substance abuse. This opinion, as well as several others, is inconsistent with plaintiff's allegations of his work capacity. (Tr. 21, 571-75).

The ALJ's credibility assessment need not be "flawless;" it passes muster as long as it is not "patently wrong." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). The analysis is deemed to be patently wrong "only when the ALJ's determination lacks any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413-414 (7th Cir. 2008). Here, the analysis is far from patently wrong. It is evident that ALJ Gaffaney considered the appropriate factors and built the required logical bridge from the evidence to his conclusions about plaintiff's testimony. *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). Therefore, his credibility determination stands.

Plaintiff argues the ALJ erred in determining his RFC by not properly evaluating the medical evidence, particularly the opinion of plaintiff's nurse practitioner, Ms. Jordan.

A treating physician's medical opinion is entitled to controlling weight only where it is supported by medical evidence and is not inconsistent with other substantial evidence in the record. *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001). The version of 20 C.F.R. §404.1527(c)(2) in effect at the time of the ALJ's decision states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations,

such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

It must be noted that, "while the treating physician's opinion is important, it is not the final word on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted). It is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527. Supportability and consistency are two important factors to be considered in weighing medical opinions. See, 20 C.F.R. §404.1527(d). In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).

Thus, the ALJ can properly give less weight to a treating doctor's medical opinion if it is inconsistent with the opinion of a consulting physician, internally inconsistent, or inconsistent with other evidence in the record. *Henke v. Astrue*, 498 Fed.Appx. 636, 639 (7th Cir. 2012); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)**.** In light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." *Berger*

*v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

ALJ Gaffaney met and exceeded this "lax" standard. First, the ALJ noted that Ms. Jordan was not an acceptable medical source under 20 C.F.R. §404.1513 and therefore her opinion could not establish the presence of a medically determinable impairment. SSR 06-3p. However, ALJ Gaffaney still evaluated Ms. Jordan's opinion. He noted that the opinion that plaintiff was unemployable was a conclusory statement that would be dispositive of the case and was reserved for determination by the Commissioner. *See*, SSR 96-5p. §20 C.F.R. 416.927(e)(noting some issues are not medical issues regarding the nature and severity of an individual's impairments, but are administrative findings that are dispositive of a case and are therefore reserved for the Commissioner).

The ALJ discussed how Ms. Jordan's opinion that plaintiff was unemployable was not supported by any significant objective facts. The portions of her opinion the ALJ felt were supported, such as plaintiff's shortness of breath, dizziness, and headaches, were accounted for within the RFC assessment provided. Finally, the ALJ determined the totality of plaintiff's medical history did not support the severity of limitations discussed in Ms. Jordan's opinions. He looked at recent treatment notes that failed to indicate plaintiff could not interact with others or function with people. (Tr. 23, 638-54, 714-17, 721-214). Therefore, it was entirely appropriate for the ALJ to discount Ms. Jordan's opinion.

Plaintiff argues that limitations involving standing, moving, bending,

walking, headaches, back pain, social capabilities, and additional psychiatric problems were not discussed appropriately by the ALJ. Plaintiff's support for these limitations comes from his own testimony and the opinions of Ms. Jordan and other providers. However, as noted above, the ALJ determined plaintiff was not entirely credible and he appropriately did not give Ms. Jordan's opinion significant weight. (Tr. 23). Additionally, the ALJ addressed and discussed the opinions noting plaintiff was "borderline mentally ill" or heard voices. However, he looked at the record as a whole and determined those opinions were not substantiated by the rest of plaintiff's medical history. Plaintiff attempts to use treatment records as an indication that plaintiff and the doctors' opinions are consistent, but the treatment records cited primarily note plaintiff's self-described complaints.

Plaintiff also takes note of low GAF scores in some of his treatment records and argues the ALJ failed to sufficiently account for these scores within his opinion. While the ALJ did not specifically cite the GAF scores in his reasoning, he did discuss the opinions containing the GAF scores. (Tr. 20). The ALJ noted plaintiff's reports of depression, hearing voices, anxiety, paranoia, and stress. He also noted plaintiff was not compliant with his medication, his course of treatment was not aggressive, and these opinions did not discuss any functional or workplace limitations due to his diagnoses. (Tr. 20). Additionally, the Seventh Circuit has held that GAF scores do "not reflect the clinician's opinion of functional capacity" and the Social Security regulations do not require an ALJ to

determine the extent of an individual's disability based on his GAF score. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Similar to *Denton*, the ALJ's finding here was substantially supported by his narrative and he did not need to rely on an unexplained numerical score.

In sum, plaintiff's argument on both of his points is, in effect, nothing more than an invitation for the Court to reweigh the evidence. However, the reweighing of evidence goes far beyond the Court's role. Even if reasonable minds could differ as to whether Mr. White is disabled, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

<u>**Conclusion**</u>

After careful review of the record as a whole, the Court is convinced that ALJ Gaffaney committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Alfonso White's application for disability benefits is **AFFIRMED**.

The clerk of court shall enter judgment in favor of defendant.

**IT IS SO ORDRED.**

Signed this 27th day of March, 2015.

Digitally signed by David R. Herndon
Date: 2015.03.27 13:42:31 -05'00'

**United States District Judge**